UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                   :

SEAN SULLIVAN,               :

                          Plaintiff,   :

                                     :

               v.                 :

                                     :

THE CITY OF NEW YORK, THE POLICE   :
DEPARTMENT OF THE CITY OF NEW   :
YORK, POLICE OFFICER THOMAS   :
BASERAP, *Shield No. 10601*, POLICE   :
OFFICER GREGORY RITTENHOUSE,   :
*Shield No. 16173*, POLICE OFFICERS   :
JOHN DOE #2, 3, 4,               :

                                   :

                    Defendants. :

                                   :

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __July 10, 2018__

17 Civ. 3779 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

      Plaintiff Sean Sullivan was arrested on May 16, 2016, for an assault that

Plaintiff maintains he did not commit, and for which ultimately he was not

prosecuted. Now proceeding *pro se*, Plaintiff asserts that he was wrongfully

detained, without probable cause or reasonable suspicion. He alleges

deprivations of his civil rights under 42 U.S.C. § 1983 in the form of false

arrest, excessive force, false imprisonment, failure to intervene, and illegal

search and seizure. Plaintiff also brings a municipal-liability claim, under

*Monell* v. *Department of Social Services*, 436 U.S. 658 (1978), against the City of

New York. Finally, Plaintiff advances state-law causes of action, including false

arrest; false imprisonment; fraud and conspiracy; intentional infliction of

emotional distress; negligence/failure to train; and violations of Sections 11 and 12 of Article I of the New York Constitution.

Pending before the Court is a Rule 12(b)(6) motion to dismiss filed by Defendants Police Officer Thomas Baserap, Police Officer Gregory Rittenhouse (together with Baserap, the "Individual Defendants"), and the City of New York (together with the Individual Defendants, the "Moving Defendants"). For the reasons stated below, the Court grants in part and denies in part Moving Defendants' motion.[1]

## BACKGROUND[2]

### A.    Factual Background

On May 16, 2016, Plaintiff visited a Barnes & Noble bookstore in the Citicorp Center on Third Avenue and 54th Street in Manhattan. (Am. Compl. ¶ 21). As he sat in the bookstore's café, an employee of the Hillstone

---

[1]    Defendants Police Officers John Doe #2, 3, and 4 have not appeared in the case and have not joined the pending motion to dismiss. The remaining defendant listed in the Amended Complaint, the New York City Police Department ("NYPD"), must be dismissed from the case because an agency of the City of New York is not an entity that can be sued. *See* N.Y. City Charter ch. 17, § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the [C]ity of New York and not in that of any agency, except where otherwise provided by law."); *Jenkins* v. *City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007); *see also Emerson* v. *City of New York*, 740 F. Supp. 2d 385, 395 (S.D.N.Y. 2010) ("[A] plaintiff is generally prohibited from suing a municipal agency.").

[2]    This Opinion draws facts from the Amended Complaint. (Dkt. #13 ("Am. Compl.")). For the purpose of adjudicating the motion to dismiss, the Court accepts as true the well-pleaded allegations in the Complaint. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam). The Court has reviewed the parties' briefing and will refer to the submissions as follows: to Moving Defendants' opening brief as "Def. Br." (Dkt. #34) and reply brief as "Def. Reply" (Dkt. #44), and to Plaintiff's opposition brief as "Pl. Opp." (Dkt. #43).

Plaintiff is an attorney proceeding *pro se* in this matter. While "a court is ordinarily obligated to afford a special solicitude to *pro se* litigants," such as by liberally construing their pleadings, "a lawyer representing himself ordinarily receives no such solicitude at all." *Tracy* v. *Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

restaurant, also located in the Citicorp Center, approached Plaintiff. (*Id.*). The employee asked Plaintiff whether he had left his bag in the Hillstone restaurant. (*Id.*). Plaintiff told the Hillstone employee that he had never been to the Hillstone and asked the employee not to disturb him, a request to which the man acceded. (*Id.*).

Shortly thereafter, a group of NYPD officers, including the Individual Defendants, approached Plaintiff. (Am. Compl. ¶ 22). They first asked Plaintiff to join them so they could "discuss something." (*Id.*). Plaintiff declined to do so. (*Id.*). The officers then insisted that Plaintiff leave with them, and Plaintiff obliged, following the officers into the lobby of the Citicorp Center. (*Id.*). There, the officers told Plaintiff that they were investigating a crime that had taken place at the Hillstone restaurant. (*Id.*). They asked Plaintiff if he knew anything about the crime. (*Id.*). Plaintiff told them he had no relevant information, and that he had never been to the restaurant. (*Id.*).

One of the police officers, whom Plaintiff believes to have been Defendant Thomas Baserap, suggested that Plaintiff was lying. (Am. Compl. ¶ 23). The officer then told Plaintiff that he was a suspect in the crime they were investigating. (*Id.*). The officer further stated "that there were witnesses who identified the Plaintiff, that there was video footage of the Plaintiff committing the crime, and that the Plaintiff needed to confess." (*Id.*). Plaintiff denied any involvement in the crime and told the officers "in no uncertain terms that he ha[d] no idea what they were talking about and that they should leave him alone as he ha[d] committed no crime." (*Id.*). Still, the officers "continued to

berate the Plaintiff, proceeded to handcuff [him], and detained him at the entrance of the Barnes [&] Noble[.]" (*Id.*).

At some point, while Plaintiff was still in handcuffs, Baserap instructed Plaintiff to move to a corner of the Barnes & Noble entrance to avoid the crowds. (Am. Compl. ¶ 25). He asked Plaintiff to sit down, but Plaintiff's "hands were handcuffed so tight behind his back that abrasions were forming on his wrists which prevented him from being able to move his body and he thereby could not physically comply with the demand that he sit on the floor." (*Id.*). When Plaintiff tried to explain, "one or more of the Police Officer Defendants tripped [Plaintiff's] legs from under him, all while the Plaintiff was handcuffed, and forced him violently to the floor." (*Id.*).

Plaintiff alleges that he was detained in this "outrageous manner," even though "there was no threat or danger of the Plaintiff leaving ... if the[ officers] had simply asked him to remain where he was earlier[.]" (Am. Compl. ¶ 26). Without any justification, the officers "humiliat[ed] the Plaintiff and creat[ed] a pointless public spectacle of the Plaintiff manacled and held down in a public venue." (*Id.*). This, despite Plaintiff's statements to the officers that "a quick examination of any security camera footage would show that the Plaintiff was nowhere near th[e] Hillstone restaurant when the 'crime' supposedly occurred[.]" (*Id.*).

Plaintiff states, "[u]pon information and belief, [that he] was the only black male sitting in the Barnes [&] Noble café at the time the Police Officer Defendants approached him." (Am Compl. ¶ 26). He further claims that the

NYPD has engaged in a pattern and practice of targeting minorities without reasonable suspicion, between at least August 2013 and November 2016. (*Id.* at ¶¶ 31-34). Plaintiff alleges that, while he was detained, officers searched his person and backpack without consent. (*Id.* at ¶ 27). At the time of the incident, Plaintiff was homeless, and substantially all of his belongings were in his backpack. (*Id.*). Yet the police officers "rummaged through the Plaintiff's bags and inspected his belongings for no valid purpose but presumably to embarrass [him.]" (*Id.*).

The officers released Plaintiff after approximately one hour. (Am. Compl. ¶ 28). Plaintiff "was never read his Miranda rights, he was never told clearly what 'crime' he was being held for, none of the Police Officer Defendants clearly identified themselves to the Plaintiff, and he was told conflicting stories by the Police Officer Defendants of being both a 'witness' and a 'suspect.'" (*Id.*). Plaintiff believes that he may have been "targeted in retaliation for his past lawsuits against the NYPD." (Am. Compl. ¶ 29).

After the police officers released Plaintiff, he went to the Hillstone restaurant to inquire into the alleged crime. (Am. Compl. ¶ 30). He "asked a hostess at the door whether a crime was committed earlier … and she told the Plaintiff that she was unaware of any crime." (*Id.*). Determined to investigate further, Plaintiff went to the local precinct and asked a police officer whether the Hillstone restaurant had been the scene of a crime earlier that day. (*Id.*). The officer told Plaintiff that "she was unaware of any criminal activity at the Hillstone restaurant that day." (*Id.*).

**B.     Procedural Background**

Plaintiff filed his initial complaint on May 18, 2017.  (Dkt. #2).  On June 2, 2017, the Court issued an order pursuant to *Valentin* v. *Dinkins*, 121 F.3d 72, 76 (2d Cir. 1997), requiring the New York City Law Department ("Law Department") to ascertain the identities and badge numbers of various John Doe Defendants whom Plaintiff had named in the Complaint.  (Dkt. #5).  The Court also ordered Plaintiff to file an amended complaint within 30 days of receiving the information from the Law Department.  (*Id.*).  On August 1, 2017, the Law Department filed a letter listing service addresses for the two Individual Defendants.  (Dkt. #7).  That day, the Court issued an Order of Service, directing the U.S. Marshals Service to effect service of Plaintiff's Complaint on these Individual Defendants.

On September 11, 2017, Plaintiff filed an amended complaint.  (Dkt. #13).  On September 19, 2017, the Court issued another Order of Service, directing the Marshals Service to effect service on the two Individual Defendants.  (Dkt. #14).  The Court also dismissed with prejudice Plaintiff's claims against then-Defendants Hillstone Restaurant Group, Inc. and John Doe #1.  (*Id.*).  On January 25, 2018, the Court held a pre-motion conference to discuss the Moving Defendants' anticipated motion to dismiss.  (*See* Dkt. #30).  Moving Defendants filed said motion on February 23, 2018 (Dkt. #32-34); Plaintiff filed his opposition brief on May 3, 2018 (Dkt. #43); and Moving Defendants filed their reply brief on May 16, 2018 (Dkt. #44).

**DISCUSSION**

Plaintiff's claims can be grouped into three categories. The first consists of Plaintiff's § 1983 claims: false arrest, excessive force, false imprisonment, failure to intervene, and illegal search and seizure. The second is Plaintiff's municipal-liability claim under *Monell*. The third includes Plaintiff's state-law causes of action, including false arrest; false imprisonment; fraud and conspiracy; intentional infliction of emotional distress; negligence/failure to train; and violations of Article I, Sections 11 and 12 of the New York Constitution. After a brief discussion of the applicable law, the Court addresses the claims in turn.

**A.      Applicable Law**

**1.      Motions Under Fed. R. Civ. P. 12(b)(6)**

When considering a motion to dismiss under Rule 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge[ a plaintiff's] claims across the line from conceivable to plausible[.]'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## 2. Claims Under 42 U.S.C. § 1983 and Qualified Immunity

Plaintiff advances various claims under 42 U.S.C. § 1983. Section 1983 "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Okla. City* v. *Tuttle*, 471 U.S. 808, 816 (1985). "To state a viable claim against an individual under 42 U.S.C. § 1983, the plaintiff must plausibly allege that the defendant, while acting under the color of law, 'deprived the plaintiff of a right guaranteed by the constitution or laws of the United States.'" *Bennett* v. *City of N.Y.*, 425 F. App'x 79, 80 (2d Cir. 2011) (summary order) (quoting *Bryant* v. *Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)). Where a plaintiff alleges municipal liability under Section 1983 — as Plaintiff has done here — he must "plausibly allege that the violation of his constitutional rights was caused by an official policy or custom of the

8

municipality." *Id.* at 81 (citing *Zahra* v. *Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995)).

Individuals sued under Section 1983 may assert that they are protected by qualified immunity. "Qualified immunity is an affirmative defense that shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stephenson* v. *Doe*, 332 F.3d 68, 76 (2d Cir. 2003) (internal quotation marks and citation omitted). Rights are "clearly established" where "existing law ... place[s] the constitutionality of the officer's conduct 'beyond debate.'" *Dist. of Columbia* v. *Wesby*, — U.S. —, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 741 (2011)). "In determining whether a right was so clearly established, the Supreme Court has emphasized that the 'dispositive inquiry ... is whether it would be clear to a *reasonable officer* that his conduct was unlawful *in the situation he confronted.'*" *Barboza* v. *D'Agata*, 676 F. App'x 9, 12 (2d Cir. 2017) (summary order) (quoting *Saucier* v. *Katz*, 533 U.S. 194, 202 (2001)). Qualified immunity protects officers when "their decision was reasonable, even if mistaken"; that, in turn, "protect[s] all but the plainly incompetent or those who knowingly violate the law." *Johnson* v. *Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (quoting *Hunter* v. *Bryant*, 502 U.S. 224, 229 (1991)).

**B.      The Motion to Dismiss Is Granted in Part and Denied in Part**

**1.      Plaintiff's Claims for False Arrest and False Imprisonment Survive**

**a.      Applicable Law**

Section 1983 claims for false arrest "derive[ ] from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly* v. *Couch*, 439 F.3d 149, 151 (2d Cir. 2006). "A [Section] 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant* v. *Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted).

To prevail on a false-arrest claim under New York law, a plaintiff must show that "[i] the defendant intended to confine the plaintiff, [ii] the plaintiff was conscious of the confinement, [iii] the plaintiff did not consent to the confinement, and [iv] the confinement was not otherwise privileged [or justified]." *Savino* v. *City of N.Y.*, 331 F.3d 63, 75 (2d Cir. 2003) (quoting *Bernard* v. *United States*, 25 F.3d 98, 102 (2d Cir. 1994)). "Under New York law, false arrest and false imprisonment are one and the same, and the elements for both are the same as for a false arrest claim under [Section] 1983." *Hershey* v. *Goldstein*, 938 F. Supp. 2d 491, 515 (S.D.N.Y. 2013).

Probable cause "is a complete defense to an action for false arrest." *Bernard*, 25 F.3d at 102. It is also a complete defense to a false-imprisonment claim. *See Shaheed* v. *City of N.Y.*, 287 F. Supp. 3d 438, 452 (S.D.N.Y. 2018).

10

Probable cause exists when officers have "reasonably trustworthy information" as to "facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been … committed by the person to be arrested." *Ackerson* v. *City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (quoting *Zellner* v. *Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)). The central inquiry is "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Id.* (quoting *Jaegly*, 439 F.3d at 153).

If a plaintiff adequately pleads a claim for false arrest or false imprisonment, the court may then consider the issue of qualified immunity. "In the context of [Section] 1983 actions predicated on allegations of false arrest, … an arresting officer is entitled to qualified immunity so long as 'arguable probable cause' was present when the arrest was made." *Figueroa* v. *Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (quoting *Zalaski* v. *City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013)). Arguable probable cause exists when an officer demonstrates that "[i] it was objectively reasonable for the officer to believe that probable cause existed, or [ii] officers of reasonable competence could disagree on whether the probable cause test was met." *Garcia* v. *Does*, 779 F.3d 84, 92 (2d Cir. 2015) (internal quotation marks and citations omitted). "[W]hether an officer's conduct was objectively reasonable" depends on "the information possessed by the officer at the time of the arrest," not "the subjective intent, motives, or beliefs of the officer." *Id.* (quoting *Amore* v. *Novarro*, 624 F.3d 522, 536 (2d Cir. 2010)). "[I]n situations where an officer may have reasonably but

mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity." *Caldarola* v. *Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002).

### b. The Pleadings Do Not Establish Probable Cause or Arguable Probable Cause

The parties do not dispute that Plaintiff was arrested by individuals acting under color of law. Instead, they disagree on the issue of probable cause: Moving Defendants argue that Baserap and Rittenhouse had probable cause to arrest Plaintiff based on the facts available to them at the time of the arrest. (Def. Br. 4-6). They further contend that the two officers are protected by qualified immunity. (*Id.* at 19-21). Plaintiff disagrees. (Pl. Opp. 11-14, 20-21). For the reasons stated below, the Court cannot find, as a matter of law, that qualified immunity applies or that probable cause existed at the time of Plaintiff's arrest.

### i. The Court Cannot Find, at This Stage of the Litigation, That Probable Cause Existed

Plaintiff alleges that, while he sat in a bookstore café, a group of police officers approached him. (Am. Compl. ¶ 22). The officers informed Plaintiff that they were investigating a crime that had occurred at a nearby restaurant. (*Id.*). Defendant Baserap told Plaintiff that he was a suspect. (*Id.* at ¶ 23). Baserap told him that there were witnesses who had identified him. (*Id.*). Baserap asserted that there was video footage of Plaintiff committing the crime. (*Id.*). Plaintiff was urged to confess. (*Id.*). After Plaintiff claimed not to know anything about the alleged crime, the officers handcuffed and detained

12

Plaintiff, before forcing him to the floor. (*Id.* at ¶¶ 23, 25). At some point, Plaintiff overheard some discussion of an assault on a Hillstone customer. (*Id.* at ¶ 24).

Moving Defendants claim that Plaintiff's allegations alone establish, as a matter of law, that Baserap and Rittenhouse had probable cause to arrest him. In their estimation, these allegations, taken as true, establish that (i) an assault had occurred at the Hillstone restaurant; (ii) there was video footage of Plaintiff committing the crime; and (iii) there were witnesses who identified Plaintiff. (Def. Br. 5-6). This, they claim, suffices to establish probable cause, particularly because "Plaintiff set[s] forth no evidence indicating that it was unreasonable for officers to rely on the information provided to them by witnesses." (*Id.* at 6).

Moving Defendants' argument is based on a flawed reading of Plaintiff's factual allegations. They suggest that the pleadings establish that "there *was* video footage of [Plaintiff] committing the crime[.]" (Def. Br. 6 (emphasis added)). But the pleadings do no such thing. Instead, Plaintiff alleges that Officer Baserap "*claim[ed]* … that there was video footage of [him] committing the crime[.]" (Am. Compl. ¶ 23 (emphasis added)). Similarly, the pleadings do not state that "there *were* witnesses who identified [Plaintiff]." (Def. Br. 6 (emphasis added)). In fact, the allegation is that Baserap "*claim[ed]* … that there were witnesses who identified [him]." (Am. Compl. ¶ 23 (emphasis

added)).[3]  Ditto for Moving Defendants' suggestion that Plaintiff alleged that he *was* a suspect of the crime being investigated.  The allegation, taken at face value, is simply that Baserap "*claim[ed]* that the Plaintiff was a 'suspect' of the 'crime' they were investigating." (*Id.* (emphasis added)).  Moving Defendants' interpretation impermissibly assumes facts not pleaded — in particular, that the police officers' statements to Plaintiff were truthful.  This Court cannot make similar assumptions.

The distance between Moving Defendants' interpretation and a fair reading of the pleadings is best illustrated by Plaintiff's allegation that the arresting officers were in fact lying when they stated that there was video footage and witnesses inculpating Plaintiff.  Plaintiff states in no uncertain terms that "he had never been in th[e Hillstone] restaurant," and that he had told the arresting officers as much.  (Am. Compl. ¶¶ 21-22).  He also explained to the officers "that a quick examination of any security camera footage would show that [he] was nowhere near th[e] Hillstone restaurant when the 'crime' supposedly occurred[.]" (*Id.* at ¶ 26).  Plaintiff's allegations suggest that the

---

[3]  In Plaintiff's opposition brief, he variously attacks Moving Defendants' reliance on the witness statements by claiming, first, that they were "fabrications" and, second, that they were unreliable.  (Pl. Opp. 10, 12).  The Court appreciates that there is some tension between asserting that there were no witness statements at all or, in the alternative, that any statements were unreliable.  Yet plaintiffs are allowed to plead and argue in the alternative.  *Polanco* v. *City of New York*, No. 14 Civ. 7986 (NRB), 2018 WL 1804702, at *10 (S.D.N.Y. Mar. 28, 2018).  As to the latter argument — that any witness statements were unreliable — Moving Defendants note that "[P]laintiff has set forth no factual basis in his pleadings indicating that it was unreasonable for officers to rely on the information provided to them by witnesses[.]" (Def. Reply 3).  Because this Court has found that Plaintiff has not, in fact, alleged that witnesses provided any information to the arresting officers, and because that finding is dispositive as to the motion to dismiss, the Court will not address the parties' dispute regarding the reliability of any witness statements.

14

police officers had not seen any video footage of him committing a crime, and that there were no witnesses who had identified him.

Plaintiff goes further still in attacking the veracity of the officers' statements: He suggests that the officers not only lied about supposed evidence connecting Plaintiff to the crime, but also about the existence of the crime itself. He states that the police officers arrested him for a crime "that did not exist in reality and [that] was concocted by them arbitrarily[.]" (Am. Compl. ¶ 28). As proof, Plaintiff recites that upon his release from police custody, he "went to the Hillstone restaurant" and "asked a hostess at the door whether a crime was committed earlier in the restaurant and she told [him] that she was unaware of any crime." (*Id.* at ¶ 30). He then went to the local police station and "asked a police officer at a desk within the precinct whether she was aware of a crime scene at Hillstone restaurant." (*Id.*). The officer "told the Plaintiff that she was unaware of any criminal activity at Hillstone restaurant that day." (*Id.*). These allegations cast doubt over the officers' statements that there was direct evidence tying Plaintiff to the purported crime. As Plaintiff writes in his opposition brief, the "statements by the Defendants were … fabrications to justify the detention of the Plaintiff in the Citigroup Center's lobby while they pretended to subdue a dangerous situation." (Pl. Opp. 10). For these reasons, the allegations do not establish, as Moving Defendants suggest, that the arresting officers had probable cause to arrest Plaintiff.

The Court notes that Plaintiff advances a second argument, in the alternative, against a finding of probable cause — namely, that in order to

establish that probable cause existed at the time of arrest, "the Defendants must present to the Court a particular criminal offense implicated by the Plaintiff's conduct at the time of the arrest and demonstrate how the Plaintiff's conduct satisfied each element of the criminal offense at issue." (Pl. Opp. 12). He asserts that, because the motion to dismiss "fails to state definitively what particular criminal offense the [Individual Defendants] concluded that they had probable cause to arrest …[,] their motion should be denied on this basis alone." (*Id.* at 11-12).

Plaintiff is incorrect to suggest that Defendants' motion to dismiss fails because it does not specify which crime the officers believed Plaintiff to have committed. In *Jaegly* v. *Couch*, the Second Circuit held that "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." 439 F.3d 149, 154 (2d Cir. 2006). The Court went on to explain that, "when faced with a claim for false arrest, we focus on the validity of the *arrest*, and not on the validity of each charge." *Id.* Therefore, Defendants' failure to identify a particular crime the arresting officers believed Plaintiff to have committed is not fatal to their motion. What is fatal — as discussed above — is their flawed reading of the pleadings.

### ii. The Court Cannot Find, at This Stage of the Litigation, That Qualified Immunity Applies

The Court next turns to the qualified immunity inquiry. The Second Circuit has explained that "the qualified immunity test 'is more favorable to the

officers than the one for probable cause.'" *Ackerson*, 702 F.3d at 21 (quoting *Escalera* v. *Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)). Indeed, qualified immunity protects officers when "their decision was reasonable, even if mistaken"; that, in turn, "protect[s] 'all but the plainly incompetent or those who knowingly violate the law.'" *Johnson*, 859 F.3d at 170 (quoting *Hunter*, 502 U.S. at 229). In deciding whether qualified immunity applies, courts assess "[i] whether plaintiff has shown facts making out [a] violation of a constitutional right; [ii] if so, whether that right was 'clearly established'; and [iii] even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez* v. *City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Taravella* v. *Town of Wolcott*, 599 F.3d 129, 133-34 (2d Cir. 2010)).

Here, Moving Defendants do not contest whether Plaintiff has alleged a violation of a clearly established constitutional right. Nor could they. The right to be free from arrest without probable cause is well-settled. *See Jenkins* v. *City of New York*, 478 F.3d 76, 86-87 (2d Cir. 2007). Instead, Moving Defendants argue that it was objectively reasonable for the officers to believe that the conduct at issue was lawful. They focus almost exclusively on the "facts" that the officers "learned from witnesses" before arresting Plaintiff. (Def. Br. 21-23 (citing Am. Compl. ¶¶ 22-24)). They state: "Courts have held that there would be arguable probable cause to arrest a plaintiff based on witness statements and here, the facts asserted by plaintiff illustrate that arguable

probable cause existed for his arrest." (*Id.* at 21 (citing *Weiner* v. *McKeefery*, 90 F. Supp. 3d 17, 40 (E.D.N.Y. 2015); Am. Compl. ¶¶ 22-24)).

Moving Defendants' argument fails for the same reason as did their probable cause argument. Plaintiff does not allege that there *were* any witness statements, only that Officer Baserap *claimed* that witnesses had identified Plaintiff as the culprit in the alleged crime. At this stage of the litigation, nothing in the record establishes that Officer Baserap — or any other police officer — had spoken to one or more witnesses, or had heard from them that Plaintiff had committed a crime. In fact, as discussed above, the allegations suggest that the police officers never spoke to any witnesses, and that the officers had fabricated the crime as a pretense to arrest Plaintiff. Though it is true that witness statements may support a finding of arguable probable cause, *see Weiner*, 90 F. Supp. 3d at 40, the allegations here do not establish that any such statements were actually made to the police officers. Accordingly, the Court rejects Moving Defendants' argument that arguable probable cause existed or that qualified immunity applies.

For these reasons, Plaintiff's Section 1983 claims for false arrest and false imprisonment survive this motion to dismiss. Because the state-law analogues are substantially identical to the Section 1983 claims for false arrest and false imprisonment, the Court need not address them separately and instead finds, for the same reasons, that the state-law claims survive. *See Weyant*, 101 F.3d at 852 ("A [Section] 1983 claim for false arrest … is substantially the same as a claim for false arrest under New York law[.]"

18

(internal citations omitted)); *Hershey*, 938 F. Supp. 2d at 515 ("Under New York law, false arrest and false imprisonment are one and the same, and the elements for both are the same as for a false arrest claim under [Section] 1983[.]"); *see also McNeese* v. *Bd. of Educ.*, 373 U.S. 668, 671 (1963) ("The federal [Section 1983] remedy is supplementary to the state remedy[.]").

### 2. Plaintiff's Claim for Unreasonable Search and Seizure Survives

#### a. Applicable Law

The Fourth Amendment to the Constitution of the United States provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. "As the text makes clear, 'the ultimate touchstone of the Fourth Amendment is reasonableness.'" *Riley* v. *Cal.*, 134 S. Ct. 2473, 2482 (2014) (quoting *Brigham City* v. *Stuart*, 547 U.S. 398, 403 (2006)). "It is well established that a warrantless search is '*per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'" *United States* v. *Diaz*, 122 F. Supp. 3d 165, 170 (S.D.N.Y. 2015) (quoting *Katz* v. *United States*, 389 U.S. 347, 357 (1967)).

One such exception is the "search incident to arrest" doctrine. Under that doctrine, police officers may search a person in connection with a lawful arrest. Put differently, "where police officers have probable cause to effect a[n] arrest, they may search the suspect without a warrant incident to that arrest." *United States* v. *Herron*, 18 F. Supp. 3d 214, 223 (E.D.N.Y. 2014) (citing *United*

*States* v. *Robinson*, 414 U.S. 218 (1973)).  The doctrine both "protect[s]" arresting officers and safeguard[s] any evidence of the offense of arrest that an arrestee might conceal or destroy."  *Ariz.* v. *Gant*, 556 U.S. 332, 339 (2009).

> **b.**  **The Court Cannot Conclude, as a Matter of Law, That the Search at Issue Was Lawful**

Moving Defendants argue that the officers' search of Plaintiff's person and property was legal because it was "part of a valid search incident to arrest."  (Def. Br. 7).  They assert that "the officers had probable cause to arrest [P]laintiff at the time of the search, and therefore, could legally search [P]laintiff's person and backpack as part of a valid search incident to arrest." (*Id.*).  They cite cases to support the simple proposition that searches incident to an arrest are permissible where there was probable cause for the arrest.  (*Id.* (citing *United States* v. *Robinson*, 414 U.S. 218, 226 (1973); *United States* v. *Hayes*, 553 F.2d 824, 826 (2d Cir. 1977); *United States* v. *Jenkins*, 496 F.2d 57, 73 (2d Cir. 1974)).  In other words, the sole argument that Moving Defendants advance against Plaintiff's search-and-seizure claim hinges on a finding that the officers had probable cause to arrest Plaintiff.

The Court has already considered — and found unpersuasive — Moving Defendants' probable cause argument.  (*See supra*).  Because Moving Defendants' argument as to the legality of the search depends upon a finding of probable cause, which finding this Court cannot make at this stage of the litigation, Moving Defendants' present argument fails.

### 3. Plaintiff's Claim for Excessive Force Fails

The Court next examines Plaintiff's excessive-force claim. The relevant allegations here are that the officers "handcuff[ed] the Plaintiff" (Am. Compl. ¶ 23); that "Plaintiff['s] hands were handcuffed so tight behind his back that abrasions were forming on his wrists" (*id.* at ¶ 25); and that, when Plaintiff was unable to comply with the officers' instruction that he sit on the floor, "one or more of the [police officers] tripped his legs from under him, all while the Plaintiff was handcuffed, and forced him violently to the floor" (*id.*).

### a. Applicable Law

"Claims that law enforcement officers have used excessive force … should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" *Graham* v. *Connor*, 490 U.S. 386, 395 (1989). "[A] *de minimis* use of force will rarely suffice to state a Constitutional claim." *Romano* v. *Howarth*, 998 F.2d 101, 105 (2d Cir. 1993). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "Whether the force used in connection with the arrest is reasonable depends on a careful weighing of the totality of the circumstances in each particular case, including whether the suspect poses a threat, resists, or attempts to evade arrest, and the severity of the crime at issue." *Felmine* v. *City of New York*, No. 09 Civ. 3768 (CBA) (JO),

2011 WL 4543268, at *18 (E.D.N.Y. Sept. 29, 2011), *reconsideration denied*,

No. 09 Civ. 3768 (CBA) (JO), 2012 WL 1999863 (E.D.N.Y. June 4, 2012).

"Courts apply a separate standard to claims for excessive force in the use

of handcuffs." *Sachs* v. *Cantwell*, No. 10 Civ. 1663 (JPO), 2012 WL 3822220,

at *14 (S.D.N.Y. Sept. 4, 2012). The modified standard "reflects the need for a

careful balance." *Usavage* v. *Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575,

592 (S.D.N.Y. 2013). "It is well established that the right to make an arrest

accompanies with it the right to use some degree of physical coercion[.]"

*Esmont* v. *City of New York*, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005). And "to

be effective handcuffs must be tight enough to prevent the arrestee's hands

from slipping out." *Id.* But "overly tight handcuffing can constitute excessive

force." *Lynch ex rel. Lynch* v. *City of Mount Vernon*, 567 F. Supp. 2d 459, 468

(S.D.N.Y. 2008).

"In analyzing excessive force claims arising out of the use of handcuffs,

courts in this circuit frequently consider '[i] whether the handcuffs were

unreasonably tight; [ii] whether the defendants ignored the plaintiff's pleas that

the handcuffs were too tight; and [iii] the degree of injury to the wrists.'"

*Gonzalez* v. *Bronx Cty. Hall of Justice Ct. Officer Mark Hirschman Shield 7421*,

No. 15 Civ. 810 (GHW), 2016 WL 354913, at *4 (S.D.N.Y. Jan. 28, 2016)

(quoting *Gonzalez* v. *City of New York*, No. 14 Civ. 7721 (LGS), 2015 WL

6873451, at *9 (S.D.N.Y. Nov. 9, 2015)). It is well established in this Circuit

that "claim[s] of excessive force [are] not established by allegations that overly

tight handcuffs caused minor, temporary injuries." *Guerrero* v. *City of New York*, No. 12 Civ. 2916 (RWS), 2013 WL 5913372, at *6 (S.D.N.Y. Nov. 4, 2013).

### b. The Alleged Injuries Are Insufficient as a Matter of Law

The Court discerns two separate acts that, in Plaintiff's view, substantiate his excessive-force claim, *viz.*, handcuffing him so tightly that "abrasions were forming on [Plaintiff's] wrists," and "tripp[ing] [Plaintiff's] legs from under him ... and forc[ing] him violently to the floor." (Am. Compl. ¶ 25). The Court addresses each in turn, beginning with the handcuffing.

### i. The Allegation of Tightly Secured Handcuffs Does Not Support an Excessive-Force Claim

The pleadings do not support a viable claim for excessive force stemming from the officers' decision to handcuff Plaintiff. Plaintiff does not allege that he asked any of the officers to loosen the handcuffs. The only reference in the Amended Complaint to any relevant communication by Plaintiff to the officers is the following: "When he tried to explain this to the Police Officers, one or more of the [officers] tripped his legs from under him[.]" (Am. Compl. ¶ 25). That sentence does not refer to the tight handcuffs, but rather to Plaintiff's inability to sit down in compliance with the officers' directives. The allegations do not suggest that he ever complained about the handcuffs. Necessarily, there is also no allegation that any of the officers ignored any pleas to loosen Plaintiff's handcuffs.

Nor is Plaintiff's allegation that the handcuffs caused "abrasions" sufficient to support a claim for excessive force. Numerous courts in this District have addressed similar claims, and they have consistently held that

such allegations do not state a claim for relief. *See, e.g., Kaplan* v. *City of New York*, No. 14 Civ. 4945 (RJS), 2018 WL 2084955, at *9 (S.D.N.Y. Mar. 22, 2018) (holding that allegation that tight handcuffs caused wrist to bleed failed as a matter of law because plaintiff "offered [no] evidence to suggest that the cut to his wrist was anything more than a superficial abrasion"); *Blue* v. *City of New York*, No. 14 Civ. 7836 (VSB), 2018 WL 1136613, at *11 (S.D.N.Y. Mar. 1, 2018) (holding that "the evidence, which comprises solely of Plaintiff's deposition testimony, shows only that his wrists were 'bruised up' … which is not an injury sufficient to state a claim for use of excessive force"); *Gonzalez*, 2016 WL 354913, at *4 (holding that "allegations of 'bruising and abrasions to [plaintiff's] wrists' as a result of the tight handcuffs are precisely the type of minor injuries routinely held by courts in this circuit to be insufficient to state a claim of excessive force" (collecting cases)); *Guerrero*, 2013 WL 5913372, at *6 (holding that allegations that tight handcuffs caused "swelling and contusions" failed to state a claim of excessive force). This Court follows the other courts in this District that have found that, without more, an allegation of abrasions caused by tight handcuffs does not support a claim of excessive force.

### ii. The Allegation That Defendants Tripped Plaintiff and Forced Him to the Floor Is Similarly Insufficient as a Matter of Law

Plaintiff also alleges that force was used to bring him to the ground. Plaintiff claims that, when he tried to explain to the officers that he was unable to sit down as requested, "one or more of the Police Officer[s] tripped [Plaintiff's] legs from under him, all while the Plaintiff was handcuffed, and forced him

violently to the floor." (Am. Compl. ¶ 25). Plaintiff does not allege any physical injury that resulted specifically from having been taken down to the ground. Plaintiff alleges generally that, as a result of his arrest and the force used against him, Plaintiff "suffered injury and damages including, inter alia, physical and mental pain, suffering, humiliation, damage to reputation[,] and emotional anguish." (*Id.* at ¶ 56).

These allegations are insufficient to state a viable claim of excessive force. Though the focus of inquiry in an excessive-force claim is on the force used rather than the injuries sustained, "[t]he extent of injury may also provide some indication of the amount of force applied." *Wilkins* v. *Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). "Courts in this district have routinely dismissed excessive force claims where the plaintiff alleged that he was thrown to the ground, but did not allege any physical injuries." *Higginbotham* v. *City of New York*, 105 F. Supp. 3d 369, 376 (S.D.N.Y. 2015) (collecting cases). Indeed, "[s]ome degree of injury is ordinarily required to state a claim of excessive force[.]" *Taylor* v. *N.Y. Dep't of Corr.*, No. 10 Civ. 3819 (JPO), 2012 WL 2469856, at *4 (S.D.N.Y. June 27, 2012) (brackets, internal quotation marks, and citation omitted). To be sure, a plaintiff "need not prove 'significant injury' to make out an excessive force claim[.]" *Griffin* v. *Crippen*, 193 F.3d 89, 92 (2d Cir. 1999). But "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano*, 998 F.2d at 105; *see also Boddie* v. *Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (finding that the allegations that plaintiff was "bumped, grabbed, elbowed, and pushed" did not rise to a level of

constitutional significance because the plaintiff did "not maintain that he experienced any pain or injury as a result of the physical contact").

Simply put, Plaintiff has not attributed any specific physical injury to having been brought to the ground. The only physical injury asserted arose from the handcuffing, which itself is insufficient to support an excessive-force claim. And the only emotional injuries are garden variety injuries — namely, "mental pain, suffering, humiliation, damage to reputation[,] and emotional anguish." (Am. Compl. ¶ 56). Without more, this conclusory assertion of mental and emotional injury is insufficient to sustain a claim of excessive force. *See, e.g.*, *Guerrero* v. *City of New York*, No. 12 Civ. 2916 (RWS), 2013 WL 673872, at *5 (S.D.N.Y. Feb. 25, 2013) (holding that an allegation that plaintiff "'suffered mental and emotional harm' … unaccompanied by allegations of a specific or identifiable mental injury, is an insufficient basis for an excessive force claim").

For these reasons, the Court finds that Plaintiff's claim of excessive force fails as a matter of law. Accordingly, the Court need not analyze whether Officers Baserap and Rittenhouse are entitled to qualified immunity on the excessive-force claim.

### 4. Plaintiff's Claim for Failure to Intervene Survives

#### a. Applicable Law

"[L]aw enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson* v. *Branen*, 17 F.3d 552, 557

(2d Cir. 1994). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know" of a constitutional violation, provided that she has "a realistic opportunity to intervene to prevent the harm from occurring." *Id.* "Liability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality." *Figueroa* v. *Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (quoting *O'Neill* v. *Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988)).

It is well established that a plaintiff may not state a claim for failure to intervene against an officer who directly participated in the allegedly unlawful conduct. *See Case* v. *City of New York*, 233 F. Supp. 3d 372, 402 (S.D.N.Y. 2017) ("[A] defendant 'cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop [himself] from committing that violation.'" (internal quotation marks omitted) (quoting *Marom* v. *City of New York*, No. 15 Civ. 2017 (PKC), 2016 WL 916424, at *19 (S.D.N.Y. Mar. 7, 2016))); *Sanabria* v. *Detective Shawn Tezlof*, No. 11 Civ. 6578 (NSR), 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016).

Yet "[w]here a plaintiff has properly alleged a constitutional violation, he is 'entitled to discovery to determine which officers participated directly in the alleged constitutional violations and which officers were present and failed to intervene.'" *Gersbacher* v. *City of New York*, 134 F. Supp. 3d 711, 725 (S.D.N.Y. 2015) (quoting *Matthews* v. *City of New York*, 889 F. Supp. 2d 418, 444 (E.D.N.Y. 2012)). That is particularly so where the allegations evince

uncertainty as to the officers' specific roles in the alleged constitutional violations. *See Folk* v. *City of New York*, 243 F. Supp. 3d 363, 376 (S.D.N.Y. 2017) (holding that plaintiff was entitled to discovery where she alleged that each of the individual defendants "directly participated in or failed to intervene in the violation of [her] rights"); *Sanabria*, 2016 WL 4371750, at *6 (holding that, though "Plaintiff names a number of officers that participated in the arrest and beating ... [t]he determination of who was specifically involved in the beating will be left to discovery"); *Gersbacher*, 134 F. Supp. 3d at 725 (holding that plaintiffs' allegations, suggesting that some officers participated in underlying constitutional violations and others witnessed the violations, permit him to "move forward to discovery").

> ### b. Plaintiff Is Entitled to Discovery Regarding the Individual Defendants' Roles, If Any, in the Alleged Constitutional Violations

Moving Defendants seek dismissal of the failure-to-intervene claim on two grounds. *First*, they assert that Plaintiff has failed to state a claim for any constitutional violations. (Def. Br. 14). The Court has already rejected this argument, finding that Plaintiff has stated a viable claim for false arrest; rather than repeat itself here, the Court incorporates by reference its earlier discussion. *Second*, Moving Defendants argue — without citing to any particular paragraphs in the Amended Complaint — that "both defendant officers Baserap and Rittenhouse are alleged to have participated in plaintiff's false arrest, excessive force, and unlawful search claims," which would preclude liability for failure to intervene. (*Id.*).

The primary question before the Court is whether the Amended Complaint attributes conduct with sufficient specificity to make unavailable a failure-to-intervene claim against either of the Individual Defendants. If indeed the allegations, taken as true, establish that Baserap or Rittenhouse directly participated in the alleged constitutional violations, dismissal of the failure-to-intervene claim would be warranted as to that officer. *See Case*, 233 F. Supp. 3d at 402. By contrast, if the allegations fail to establish direct participation, Plaintiff must be afforded an opportunity to engage in discovery in the hopes of clarifying what role, if any, the Individual Defendants played in the alleged violations. *See Gersbacher*, 134 F. Supp. 3d at 725.

The relevant allegations of constitutional violations are those related to Plaintiff's false-arrest and unreasonable-search-and-seizure claims. The Court begins with the false-arrest claim. The allegations advanced in support of that claim do not ascribe specific roles to particular individuals, but rather refer to the police officers in the collective. For example, Plaintiff claims that while he was sitting in the Barnes & Noble, "a team of employees of the NYPD, including certain of the Police Officer Defendants, approached [him] … and asked him to go with them as they wanted to discuss something." (Am. Compl. ¶ 22). "[T]hese police officers would not take no for an answer and indicated that the Plaintiff needed to leave with them immediately[.]" (*Id.*). Outside the store, "some of the Police Officer Defendants stated … that they [we]re investigating a crime … and that he needed to tell them what [he] knew about it." (*Id.*). "The Police Officer Defendants … berate[d] the Plaintiff, proceeded to handcuff the

Plaintiff, and detained him at the entrance of the Barnes [&] Noble[.]" (*Id.* at ¶ 23). That last allegation is particularly relevant here: Plaintiff has not identified which of the officers handcuffed and detained him.

The only allegation relevant to the false-arrest claim that refers to a particular officer states:

> One of the police officers, upon information and belief, Police Officer Baserap, then stated that the Plaintiff was lying. As the back and forth with the Police Office[r] Defendants continued, Police Officer Baserap eventually made the claim that the Plaintiff was a "suspect" of the "crime" they were investigating, that there were witnesses who identified the Plaintiff, that there was video footage of the Plaintiff committing the crime, and that the Plaintiff needed to confess.

(Am. Compl. ¶ 23). This allegation, of course, does not reference Officer Rittenhouse by name. And though it does specifically refer to Officer Baserap, it alone is insufficient to establish that he participated in the constitutional violation. Plaintiff alleges that this exchange came *before* he was handcuffed and detained. Plaintiff does not allege that, at the time that Officer Baserap confronted him, he had already been placed under arrest, nor that Baserap participated in the later arrest. When Plaintiff discusses the arrest, he reverts to speaking of the officers as a collective. (*Id.* ("The Police Officer Defendants … proceeded to handcuff the Plaintiff, and detained him[.]")). For this reason, the Court cannot find that Plaintiff's allegations establish direct participation by either of the Individual Defendants.

The same is true for Plaintiff's search-and-seizure claim. The Amended Complaint evinces Plaintiff's lack of knowledge as to which officers, if any,

conducted the search.  Plaintiff states that "certain of the Police Officer

Defendants, likely Police Officers Rittenhouse and Baserap, searched the

Plaintiff's person and backpack without the Plaintiff's consent[.]"  (Am. Compl.

¶ 27).  The term "likely" suggests that Plaintiff does not know with any

certainty who searched him and his belongings.  That uncertainty is

underscored by Plaintiff's allegation that "certain of the Police Officer[s]"

participated in the search.  Though he names Baserap and Rittenhouse as

having "likely" been among those involved, the allegations admit the possibility

that Baserap and Rittenhouse did not directly participate.  Under the

circumstances, the Court cannot conclude that Plaintiff has alleged direct

participation by the Individual Defendants.  Accordingly, Plaintiff is entitled to

discovery to determine which officers arrested and conducted the subsequent

search, and which officers were present and failed to intervene in the alleged

constitutional violations.

### 5.    Plaintiff's *Monell* Claim Fails

The Court next turns to Plaintiff's *Monell* claim against the City of New

York.  For the reasons set forth below, the Court dismisses the claim.

#### a.    Applicable Law

Under Section 1983, municipalities may not be held "vicariously liable …

for their employees' actions."  *Connick* v. *Thompson*, 563 U.S. 51, 60 (2011)

(citing *Monell*, 436 U.S. at 691).  They may, however, be liable for "their *own*

illegal acts."  *Pembaur* v. *City of Cincinnati*, 475 U.S. 469, 479 (1986)).  To

prevail on a municipal-liability claim under Section 1983 based on a public

official's acts, "a plaintiff is required to prove: [i] actions taken under color of law; [ii] deprivation of a constitutional or statutory right; [iii] causation; [iv] damages; and [v] that an official policy of the municipality caused the constitutional injury." *Roe* v. *City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). "[T]here must be a 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Tieman* v. *City of Newburgh*, No. 13 Civ. 4178 (KMK), 2015 WL 1379652, at *12 (S.D.N.Y. Mar. 26, 2015) (quoting *City of Canton* v. *Harris*, 489 U.S. 378, 385 (1989)). Indeed, "a municipality can be liable under [Section] 1983 only where its policies are the moving force [behind] the constitutional violation." *Outlaw* v. *City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) (quoting *City of Canton*, 489 U.S. at 389).

To satisfy the "policy or custom" requirement, a plaintiff must allege any of the following:

> [i] a formal policy officially endorsed by the municipality; [ii] actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; [iii] a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or [iv] a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon* v. *City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (internal citations omitted). "[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo* v. *Fry,* 141 F.3d 56, 61 (2d Cir.

1998) (quoting *Ricciuti* v. *N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).

The last of the four categories — a municipality's deliberate indifference to the rights of members of the public — "is a stringent standard of fault," *Connick*, 563 U.S. at 61, under which "[a] showing of simple or even heightened negligence will not suffice," *Bd. of Cty. Comm'rs of Bryan Cty., Okla.* v. *Brown*, 520 U.S. 397, 407 (1997). As the Second Circuit has stated, "[t]he operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence." *Amnesty Am.* v. *Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004). "The inference that a [municipal] policy existed may ... be drawn from circumstantial proof, such as ... evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers had ... violat[ed] the complainants' civil rights." *Ricciuti*, 941 F.2d at 123.

### b. Plaintiff Has Not Alleged Any Causal Relationship Between a Municipal Policy or Practice and His Injuries

Plaintiff alleges that the City of New York had a "de facto municipal policy" of targeting minorities for suspicionless stops and frisks. (Am. Compl. ¶ 34). To substantiate that claim, Plaintiff points to *Floyd* v. *City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013), in which a court in this District held that the NYPD had engaged in a pattern of such behavior and a policy of targeting black and Hispanic New Yorkers. (Am. Compl. ¶¶ 31-34 (citing *Floyd*, 959 F. Supp. 2d at 660-67)). Plaintiff cites the *Floyd* Court's finding that, "in 4.4 million police stops analyzed over an eight[-]year period, over 80% of such

stops involved blacks and Hispanics." (*Id.* at ¶ 32 (citing *Floyd*, 959 F. Supp. 2d at 556)).  He notes that the *Floyd* Court concluded that the NYPD's stop-and-frisk policy "leads NYPD officers to stop blacks and Hispanics who would not have been stopped if they were white." (*Id.* (quoting *Floyd*, 959 F. Supp. 2d at 603)).

Plaintiff notes that, "[p]ursuant to court orders and implementation agreements between NYC and th[e *Floyd*] plaintiffs, an independent monitor was designated to oversee NYPD reforms to avoid the continuing violation of the constitutional rights of New Yorkers." (Am. Compl. ¶ 31).  He observes that, "[e]ven though a monitor has been appointed to ensure that the NYPD reforms its practices … , this selfsame monitor has told the federal court in as late as November 2016 that the NYPD has been slow to reform its pattern and practices." (*Id.* at ¶ 33).  Plaintiff concludes:

> Given the slowness with which NYC has taken action to implement the reforms required of the NYPD by a federal court according to the NYPD's court-appointed monitor, and the NYPD's continual custom and practice of violating the constitutional rights of a vulnerable section of the city's population, this Court can conclude that NYC has a de facto municipal policy of trampling on the constitutional rights of certain arrestees detained without reasonable suspicion by officers of the NYPD[.]

(*Id.* at ¶ 34).  "At the very least, … NYC's lack of implementation of court-mandated reforms is evidence … of its deliberate indifference to the continuing unconstitutional misconduct of the NYPD." (*Id.*).

As an initial matter, the Court addresses whether Plaintiff has sufficiently alleged the existence of a municipal "policy or custom" that existed

in May 2016, when the conduct relevant to this case occurred. The factual allegations taken from the *Floyd* Court's decision — which constitute nearly all of the facts that Plaintiff asserts relevant to the municipal-policy question — relate to NYPD practices in the years prior to the decision's issuance in August 2013. By contrast, the events at issue here took place nearly three years after the *Floyd* decision was issued. The factual allegations that relate to the *Floyd* Court's findings of fact are inapposite and will not, on their own, establish a municipal "policy or custom" relevant to this case. *Cf. Bishop* v. *City of New York*, No. 13 Civ. 9203 (AJN), 2016 WL 4484245, at *4 (S.D.N.Y. Aug. 18, 2016) (finding, in a case involving a December 2010 stop and frisk, that *pro se* plaintiff's factual allegations, including statistics, reports of whistleblowers, and the *Floyd* Court's findings of fact were sufficient "to plausibly allege a municipal policy").

The only allegations of a municipal policy extant in May 2016 are: (i) in March 2016, the NYPD adopted a revised "stop report form," which "the [court-appointed] monitor submitted and the court approved" (Am. Compl. ¶ 31); and (ii) in November 2016, the court-appointed monitor "told the federal court … that the NYPD ha[d] been slow to reform its pattern and practices" (*id.* at ¶ 33). These are insufficient to support a *Monell* claim. Plaintiff concedes that, by May 2016, the NYPD had taken some steps to address the *Floyd* Court's concerns. Plaintiff claims that the City's delay in implementing a wider range of reforms illustrates its "deliberate[ ] indifferen[ce] to the Plaintiff's constitutional rights by failing to train and supervise employees of the NYPD in

accordance with an implementation agreement of a federal court[.]" (*Id.* at ¶ 54).

The Court disagrees. To be sure, a failure to act might, under certain circumstances, support a deliberate-indifference claim. Yet Plaintiff concedes that, in response to the *Floyd* decision, the City took some measures to protect against further constitutional violations. Plaintiff himself alleges that the City revised its stop report form, which was met with court approval. Plaintiff's theory of indifference rests on his view that the City did not act quickly enough. But under controlling precedent, that is insufficient to support a *Monell* claim. The Supreme Court has explained that deliberate indifference is "a stringent standard of fault[.]" *Connick*, 563 U.S. at 61. And the Second Circuit has further explained that, "the operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence." *Amnesty Am.*, 361 F.3d at 128. Nowhere does Plaintiff allege that the delay in the City's actions was a "conscious choice[.]" *Id.* If anything, the City's decision to implement certain reforms suggests that it was working to ameliorate the problems that the *Floyd* Court identified. Under the circumstances, the Court cannot find that Plaintiff has identified a municipal policy or practice that might support a *Monell* claim against the City.

Plaintiff's *Monell* claim fails for a second reason. Put simply, Plaintiff has not adequately alleged that the stop-and-frisk policy was the "moving force" — the proximate cause — of his arrest or the search attendant to that arrest. To the contrary, Plaintiff has alleged various theories as to why the officers

36

targeted him.  He suggests that the police officers colluded with an employee of the Hillstone restaurant to lure Plaintiff out of the Barnes & Noble and to arrest him.  (Am. Compl. ¶¶ 21-22, 28).  He asserts that the officers may have targeted him in retaliation for lawsuits he had previously filed against the NYPD.  (*Id.* at ¶ 29).  In the alternative, he suggests that the officers targeted him to "appear … in control of a dangerous situation that did not exist in reality[.]"  (*Id.* at ¶ 28).

What Plaintiff does not allege, in non-conclusory terms, is that he was targeted on account of his race.  To be sure, he states that he was "the only black male sitting in the Barnes [&] Noble café at the time the Police Officer Defendants approached him."  (Am Compl. ¶ 26).  He also suggests that "[t]he unconstitutional acts described herein … w[ere] a[t] least partially caused by a municipal policy of stopping and detaining citizens of New York City for no other reason than their racial and financial background[.]"  (*Id.* at ¶ 53).  Yet Plaintiff does not substantiate that claim with reference to circumstances surrounding his own arrest.  The facts alleged therefore do not establish a clear causal connection between the stop-and-frisk policy and Plaintiff's treatment.  Simply put, the chain of causation, if any, between the stop-and-frisk policy and Plaintiff's arrest is attenuated; it is interrupted by other reasons offered by Plaintiff, including retaliation.  Plaintiff's *Monell* claim therefore fails.  *See Graham* v. *City of New York*, No. 16 Civ. 4613 (NGG) (CLP), 2018 WL 1157818, at *8 (E.D.N.Y. Mar. 2, 2018); *Outerbridge* v. *City of New York*, No. 13 Civ. 5459 (AT) (DCF), 2015 WL 5813387, at *5 (S.D.N.Y. Sept. 30, 2015); *Peterec* v. *City of*

*New York*, No. 14 Civ. 309 (RJS), 2015 WL 1027367, at *6-7 (S.D.N.Y. Mar. 6, 2015).

### 6. Plaintiff's Claim for State-Law "Fraud and Conspiracy" Fails

The Court next turns to Plaintiff's state-law claims, beginning with his claim for "fraud and conspiracy." The Court notes that, although Plaintiff refers to the claim as one for "fraud and conspiracy," the pleadings themselves suggest that Plaintiff advances a claim for conspiracy, not fraud. Plaintiff asserts that the Police Officer Defendants and John Doe #1 "conspired to lure the Plaintiff out of the Barnes [&] Noble café under false pretenses and fraudulently bring to bear the resources of the NYPD to create a public spectacle for no legitimate purpose but instead to humiliate the Plaintiff in public." (Am. Compl. ¶ 78). The "fraud" portion of Plaintiff's "fraud and conspiracy" claim repackages Plaintiff's false-arrest, false-imprisonment, and search-and-seizure claims. Indeed, the "fraud" consists of the fact that "Defendants did not possess legitimate charges against the Plaintiff, but still falsely imprisoned the Plaintiff, using excessive force and subject[ing] the Plaintiff to gratuitous and unreasonable searches in the middle of a busy public venue[.]" (*Id.*). Because the Court has already addressed the various causes of action that Plaintiff here terms "fraud," it will not reevaluate them under a different name. Instead, the Court construes the claim — consistent with the relevant allegations in the Amended Complaint — as one for civil conspiracy.

### a.  Applicable Law

New York "does not recognize civil conspiracy to commit a tort … as an independent cause of action[.]"  *Dickinson* v. *Igoni*, 908 N.Y.S.2d 85, 88 (2d Dep't 2010) (internal citations omitted).  However, "a plaintiff may plead the existence of a conspiracy in order to connect the actions of the individual defendants with an actionable, underlying tort and establish that those actions were part of a common scheme[.]"  *Litras* v. *Litras*, 681 N.Y.S.2d 545, 546 (2d Dep't 1998) (citations omitted).  Under New York law, a plaintiff "may plead the existence of a conspiracy … to demonstrate that each defendant's conduct was part of a common scheme."  *World Wrestling Fed'n Entm't, Inc.* v. *Bozell*, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2001) (citations omitted).  To establish a claim of civil conspiracy, a plaintiff "must demonstrate the primary tort, plus the following four elements:  [i] an agreement between two or more parties; [ii] an overt act in furtherance of the agreement; [iii] the parties' intentional participation in the furtherance of a plan or purpose; and, [iv] resulting damage or injury."  *Id.* (citation omitted).

### b.  Plaintiff's Conspiracy Claim Fails

The Court begins by noting that, although Plaintiff brings a conspiracy claim against, *inter alia*, John Doe #1 and the Hillstone Restaurant, the Court had previously dismissed, with prejudice, all claims against those defendants.  Plaintiff's conspiracy claim against those defendants must therefore fail.  The claim similarly fails against the Individual Defendants.  Plaintiff alleges that they conspired with John Doe #1 to lure Plaintiff out of the Barnes & Noble

café in order to effectuate his arrest. Nowhere in the pleadings does Plaintiff plausibly allege an agreement between the Individual Defendants and John Doe #1 — nor, for that matter, between the Individual Defendants and the Hillstone restaurant or even among the Individual Defendants and the other officers. Instead, Plaintiff merely asserts that John Doe #1 initially came up to Plaintiff asking if he had left a bag in the Hillstone restaurant, and 15 minutes later, the Police Officer Defendants approached him. (Am. Compl. ¶¶ 21-22). Plaintiff appears to ask this Court to infer from the temporal proximity between John Doe #1's departure and the arrival of the police officers that they had conspired to lure him out of the restaurant.

The Court cannot — and will not — make this inferential leap. The Amended Complaint is devoid of any allegations of an agreement, explicit or otherwise, between the Defendants. Under controlling precedent, plaintiffs must plead enough facts to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Here, the factual allegations do not support a conceivable claim for relief. Accordingly, Plaintiff's conspiracy claim fails.

### 7. Plaintiff's Claim for Intentional Infliction of Emotional Distress Fails

#### a. Applicable Law

Under New York law, a claim for intentional infliction of emotional distress ("IIED") has four elements: "[i] extreme and outrageous conduct; [ii] intent to cause, or disregard of a substantial probability of causing, severe emotional distress; [iii] a causal connection between the conduct and injury;

and [iv] severe emotional distress." *Howell* v. *N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993). "In practice, courts have tended to focus on the outrageousness element, the one most susceptible to determination as a matter of law[.]" *Id.* The alleged misconduct "must be ... 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community[.]'" *Dillon* v. *City of New York*, 704 N.Y.S.2d 1, 7 (1st Dep't 1999). As a sister court in this District has explained, this standard constitutes an "exceedingly high threshold deliberately instituted by the New York [c]ourts[.]" *Gilani* v. *Nat'l Ass'n of Secs. Dealers*, No. 96 Civ. 8070 (SMS), 1997 WL 473383, at *14 (S.D.N.Y. Aug. 19, 1997). Indeed, "[t]he New York Court of Appeals has strongly cautioned against allowing emotional distress claims to be brought where other tort remedies are available." *Moore* v. *City of New York*, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002) (citing *Fischer* v. *Maloney*, 43 N.Y.2d 553 (1978)). "In New York, '[IIED] is a theory of recovery that is to be invoked only as a last resort,' when traditional tort remedies are unavailable." *Naccarato* v. *Scarselli*, 124 F. Supp. 2d 36, 44 (N.D.N.Y. 2000) (quoting *EEOC* v. *Die Fliedermaus*, 77 F. Supp. 2d 460, 472 (S.D.N.Y. 1999)).

### b. Plaintiff's Allegations Are Insufficient to Support a Claim for Intentional Infliction of Emotional Distress

Although "[p]ublic policy bars claims for [IIED] against a governmental entity," *Liranzo* v. *N.Y.C. Health and Hosp. Corp.*, 752 N.Y.S.2d 568, 568 (2d Dep't 2002), IIED claims may be brought against individual police officers, *see, e.g.*, *Scollar* v. *City of New York*, 74 N.Y.S.3d 173, 178 (1st Dep't 2018). Here,

however, Plaintiff's allegations do not meet the requisite level of outrageous behavior. The most egregious conduct alleged in the Amended Complaint is the police's purported targeting of Plaintiff in retaliation for lawsuits he had previously filed against NYPD personnel. Though this conduct, if true, might rise to the level of outrageousness required for an IIED claim, the Court need not address that question, because the allegation itself is conclusory and couched in uncertainty. Plaintiff writes: "And given that the Plaintiff had sued NYPD personnel in the past for alleged misconduct, the Plaintiff could not rule out that he was being arbitrarily targeted in retaliation for his past lawsuits against the NYPD." (Am. Compl. ¶ 29). Plaintiff provides no grounds on which the Court could assess the plausibility of this claim: No statements by the officers suggestive of retaliatory intent, no connection between the arresting officers and the NYPD personnel against whom Plaintiff previously filed lawsuits, no mention of the gap in time between the prior lawsuits and Plaintiff's arrest in May 2016. And Plaintiff does not affirmatively state that the officers had arrested him in retaliation for those prior lawsuits; he only states that he could not exclude that possibility. That is simply not enough.

Even if the other allegations of misconduct could support claims for false arrest, failure to intervene, and unreasonable search and seizure, they do not support an IIED claim. Rather, the well-pleaded IIED allegations are co-extensive with the allegations that give rise to Plaintiff's false-arrest claim. New York courts routinely dismiss IIED claims where they are "duplicative of … causes of action alleging false arrest and false imprisonment[.]" *Rodgers* v. *City*

42

*of New York*, 966 N.Y.S.2d 466, 469 (2d Dep't 2013) (listing cases); *see also Brewton* v. *City of New York*, 550 F. Supp. 2d 355, 370 (E.D.N.Y. 2008) (concluding that although the plaintiff's false arrest may have qualified as extreme and outrageous, "to the extent that [the plaintiff] contends she suffered emotional distress as a result of the false arrest, her claim is encompassed entirely within other tort remedies and is thus precluded under New York law"). Because Plaintiff has separately brought claims for false arrest and false imprisonment, and because the only well-pleaded IIED allegations are the same as those that give rise to Plaintiff's other claims, the Court grants Moving Defendants' motion to dismiss the IIED claim.

### 8. Plaintiff's Claims for State-Law Negligence and Failure to Train Fail

Plaintiff asserts a negligence claim against the City of New York and Officers Baserap and Rittenhouse. He claims that the Individual Defendants "carelessly and recklessly performed their duties in that they failed to use such care in the performance of their police duties as a reasonably prudent and careful police officer would have used under similar circumstances[.]" (Am. Compl. ¶ 92). He further asserts that "the false arrest, false imprisonment, excessive force, [and] unlawful search and seizure … were caused wholly and solely by reason of the negligence of the Defendant[ ] NYC[.]" (*Id.* at ¶ 93). Plaintiff also advances a failure-to-train claim against the City, alleging that it "carelessly and recklessly failed to properly train and supervise [its] employees[.]" (*Id.* at ¶ 91).

43

For the reasons stated below, the Court dismisses the negligence and failure-to-train claims.

### a. Applicable Law

### i. Negligence

To prevail on a claim for negligence under New York law, a plaintiff must establish "[i] the existence of a duty on the defendant's part as to the plaintiff; [ii] a breach of that duty; and [iii] resultant injury to the plaintiff." *Field Day, LLC* v. *Cty. of Suffolk*, No. 04 Civ. 2202 (DRH) (WDW), 2005 WL 2445794, at *23 (E.D.N.Y. Sept. 30, 2005). However, "harm predicated on an intentional act may not give rise to a claim of negligence." *Bah* v. *City of New York*, No. 13 Civ. 6690 (PKC) (KNF), 2014 WL 1760063, at *13 (S.D.N.Y. May 1, 2014); *see also Dineen* v. *Stramka*, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002) ("When a plaintiff asserts excessive force and assault claims which are premised upon a defendant's intentional conduct, a negligence claim with respect to the same conduct will not lie.").

Under New York law, "a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." *Bernard* v. *United States*, 25 F.3d 98, 102 (2d Cir. 1994) (citing *Dirienzo* v. *United States*, 690 F. Supp. 1149, 1155 (D. Conn. 1988) (construing New York law); *Boose* v. *City of Rochester*, 421 N.Y.S.2d 740, 743 (4th Dep't 1979)). New York courts have long held that, where a plaintiff brings false-arrest and false-imprisonment claims, she cannot also recover under broad principles of

negligence. *See Secard* v. *Dep't of Social Servs. of Cty. of Nassau*, 612 N.Y.S.2d 167, 168 (2d Dep't 1994); *Stalteri* v. *Cty. of Monroe*, 486 N.Y.S.2d 555, 556 (4th Dep't 1985).

### ii.        **Failure to Train**

Under New York law, a failure-to-train claim generally cannot survive where the alleged injuries are caused by an employee acting within the scope of her employment. As one court explained, "[g]enerally where … the employee was acting within the scope of his employment, the employer may be held liable for the employee's torts under a theory of respondeat superior, and no claim may proceed against the employer for negligent supervision or training under New York common law[.]" *Holland* v. *City of Poughkeepsie*, 935 N.Y.S.2d 583, 592-93 (2d Dep't 2011) (citing *Eckardt* v. *City of White Plains*, 930 N.Y.S.2d 22, 25 (2d Dep't 2011); *Talavera* v. *Arbit*, 975 N.Y.S.2d 708, 709 (2d Dep't 2005); *Karoon* v. *N.Y.C. Transit Auth.*, 659 N.Y.S.2d 27, 29 (1st Dep't 1997)). "An exception to the general rule exists in cases where a plaintiff seeks punitive damages from the employer based on alleged gross negligence[.]" *Bah*, 2014 WL 1760063, at *14.

### b.        **Plaintiff's Claim of Negligence Fails**

Plaintiff's negligence claim fails as to each of the Defendants for at least two reasons. For starters, all of the conduct ascribed to Officers Baserap and Rittenhouse — and indeed to all of the police officers mentioned in the Amended Complaint — was intentional. The officers "approached [ ] Plaintiff while he sat in [a] café[.]" (Am. Compl. ¶ 22). They told Plaintiff "that [he]

needed to leave with them immediately or else." (*Id.*). When Plaintiff denied any involvement in the alleged crime, they insinuated that he was lying. (*Id.* at ¶ 23). They "berate[d] the Plaintiff, proceeded to handcuff the Plaintiff, and detained him at the entrance of the Barnes [&] Noble[.]" (*Id.*). They eventually "insisted that the Plaintiff move to a corner of the entryway … [and] one or more of the [officers] tripped [Plaintiff's] legs from under him, all while the Plaintiff was handcuffed[.]" (*Id.* at ¶ 25). All of the actions alleged in the Amended Complaint were intentional. Accordingly, the negligence claim against the Individual Defendants fails as a matter of law. *See Stramka*, 228 F. Supp. 2d at 454. And because that claim fails, the attendant claim against the City for vicarious liability similarly fails. *See, e.g.*, *Karaduman* v. *Newsday, Inc.*, 51 N.Y.2d 531, 546 (1980) (holding that "it is manifest that there can be no vicarious liability on the part of the employer if the employee himself is not liable").

The claim also fails for an independent reason: Plaintiff advances false-arrest and false-imprisonment claims, in addition to his negligence claim. "[A] plaintiff seeking damages for an injury resulting from a wrongful arrest and detention 'may not recover under broad general principles of negligence but must proceed by way of the traditional remedies of false arrest and imprisonment.'" *Secard*, 612 N.Y.S.2d at 168 (quoting *Stalteri*, 486 N.Y.S.2d at 556). This bars the negligence claim as to all Defendants, including the City of New York. *See Burbar* v. *Inc. Vill. of Garden City*, 961 F. Supp. 2d 462, 474 (E.D.N.Y. 2013) (holding that negligence claim against municipality was barred

because, under New York law, "a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest" (internal citation omitted)).

### c. Plaintiff's Claim Based on Allegations of a Failure to Train Fails

The Court easily disposes of Plaintiff's claim against the City of New York for failure to train its employees. As stated above, New York law does not recognize a negligent-training claim where the allegedly negligent employees were acting within the scope of their employment. *See Eckardt*, 930 N.Y.S.2d at 25. Plaintiff does not contend — nor could he — that the police officers were acting outside the scope of their employment when they approached Plaintiff, questioned him, handcuffed him, and tripped him. And although Plaintiff seeks punitive damages, which in some instances may allow a plaintiff to pursue negligent-training claims even where the employee acted within her scope of employment, when a municipality is the employer, punitive damages are not available as a matter of law. *Sharapata* v. *Town of Islip*, 56 N.Y.2d 332, 334 (1982). For these reasons, under New York law, Plaintiff's claim for failure-to-train fails.

### 9. Only One of Plaintiff's Claims Under the New York Constitution Survives

Finally, the Court addresses Plaintiff's claim for violations of Article I, Sections 11 and 12 of the New York Constitution. In particular, Plaintiff asserts that he "was deprived of his right to equal protection under the law and was subjected to discrimination based on his race … in violation of [Section

11],” and that he “was deprived of his right to be free from unreasonable searches and seizures … in violation of [Section 12].” (Am. Compl. ¶ 96). For the following reasons, the Court dismisses Plaintiff’s Section 11 claim as to the Moving Defendants and his Section 12 claim as to the Individual Defendants, but denies the motion to dismiss Plaintiff’s Section 12 claim as to the City.

### a.    Applicable Law

Article I, Section 11 of the New York State Constitution provides that “[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof.” N.Y. Const., art. I, § 11. Like its federal counterpart, it “commands that persons similarly situated should be treated alike[.]” *Walton* v. *N.Y. State Dep’t of Corr.*, 13 N.Y.3d 475, 492 (2009) (internal quotation marks and citation omitted). Section 12, for its part, guarantees “[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures[.]” N.Y. Const., art. I, § 12.

In *Brown* v. *State*, the New York Court of Appeals recognized the viability of a constitutional-tort claim — that is, a cause of action for damages based on official conduct that violated the State’s Constitution. 89 N.Y.2d 172, 192 (1996). The Court also explained that any such cause of action is a “narrow remedy,” *id.*; it is only available when “necessary to effectuate the purposes of the State constitutional protections [that the] plaintiff invokes” or “appropriate to ensure full realization of [the plaintiff’s] rights,” *Martinez* v. *City of Schenectady*, 97 N.Y.2d 78, 83 (2001). The private right of action under the State Constitution is available only where the plaintiff “ha[s] no [alternative]

remedy[.]" *Wahad* v. *F.B.I.*, 994 F. Supp. 237, 240 (S.D.N.Y. 1998); *see also*

*Alwan* v. *City of New York*, No. 14 Civ. 4556 (NGG) (VMS), 2018 WL 2048366,

at *10 (E.D.N.Y. May 2, 2018) ("New York courts have held that a private right

of action for violations of the state constitution is unavailable if an alternative

remedy is available elsewhere, such as under state tort law[.]").

> **b.** **Plaintiff's Section 11 Claim Fails**

The Court begins with Plaintiff's Article I, Section 11 claim. The

threshold question here, in determining whether a private right of action may

be inferred, is whether an alternative remedy exists elsewhere. The Court

notes that Plaintiff has not advanced an Equal Protection Clause claim under

Section 1983. His failure to do so is fatal to his claim under Article I, Section

11 of the New York Constitution, given that a Section 1983 claim alleging

violation of the Equal Protection Clause would have constituted an adequate

alternative remedy. Indeed, Article I, Section 11 of the New York State

Constitution "was intended to afford coverage as broad as that provided by the

Fourteenth Amendment." *Brown*, 89 N.Y.2d at 190. Plaintiff therefore had an

alternative remedy available to him under federal law, but chose not to pursue

it. Because a State constitutional cause of action is a "narrow remedy,"

available only when a plaintiff lacks any other remedies to protect his rights,

Plaintiff's failure to advance a Section 1983 claim bars him from advancing a

Section 11 claim.

Even if the Court found otherwise on this threshold matter, Plaintiff's

claim still would not survive the motion to dismiss. Plaintiff's claim of

discriminatory treatment is supported by a single factual allegation.  He writes: "[u]pon information and belief, the Plaintiff was the only black male sitting in the Barnes [&] Noble café at the time the Police Officer Defendants approached him." (Am Compl. ¶ 26).  As mentioned above, Plaintiff provides no other factual allegations to support a claim for racial discrimination:  Nothing about the arresting officers' statements or the manner in which the officers conducted their duties that might plausibly suggest a Section 11 violation.  And Plaintiff himself has suggested that he was targeted in retaliation for having previously filed lawsuits against NYPD personnel, or simply because the arresting officers wished to appear to be in control of the situation.  (*Id.* at ¶¶ 28-29).  Because of the paucity of Plaintiff's factual allegations suggestive of racial discrimination, and because Plaintiff failed to pursue alternative remedies available to him, Plaintiff's Section 11 claim cannot survive Defendants' motion to dismiss.

### c.    Plaintiff's Section 12 Claim Fails as to Officers Baserap and Rittenhouse

Plaintiff's claim under Article I, Section 12 of the New York Constitution mirrors his claim under Section 1983 for unreasonable search and seizure.  In his Section 12 claim, Plaintiff asserts that he "was deprived of his right to be free from unreasonable searches and seizures[.]" (Am. Compl. ¶ 96).  In his Section 1983 claim, he states that Officers Baserap and Rittenhouse "took various actions in furtherance of the deliberate and unconstitutional search of the Plaintiff and his property without legal justification." (*Id.* at ¶ 42).  Courts have consistently held that where "a plaintiff has asserted a viable Fourth Amendment claim … under Section 1983 'any [violation] of the plaintiff['s] right

to be free of unreasonable searches and seizures can be vindicated through this claim." *Wood* v. *Town of E. Hampton*, No. 08 Civ. 4197 (DRH), 2010 WL 3924847, at *28 (E.D.N.Y. Sept. 30, 2010) (quoting *Coakley* v. *Jaffe*, 49 F. Supp. 2d 615, 629 (S.D.N.Y. 1999), *abrogated on other grounds by Ginsberg* v. *Healey Car & Truck Leasing, Inc.*, 189 F.3d 268 (2d Cir. 1999)).  Because Plaintiff has asserted a viable Section 1983 claim against Officers Baserap and Rittenhouse, his Section 12 claim against them fails.

### d. Plaintiff's Section 12 Claim Survives as to the City of New York

The Court has already found that Plaintiff's municipal-liability claim under Section 1983 fails.  The Court now turns to Plaintiff's Section 12 claim against the City.  The question before the Court is whether the *Monell* claim provided Plaintiff with an adequate alternative remedy to the Section 12 claim.

The Court begins with a brief review of the requisites for municipal liability under Section 1983.  A plaintiff may not assert Section 1983 claims against municipalities under a theory of respondeat superior.  *Monell*, 436 U.S. at 691-95.  Instead, a plaintiff can only recover against a municipality for "[its] *own* illegal acts." *Pembaur*, 475 U.S. at 479.  Absent a showing of a "municipal policy or custom" and a "'direct causal link ... [with] the alleged constitutional deprivation," *Tieman*, 2015 WL 1379652, at *12 (quoting *City of Canton*, 489 U.S. at 385), a plaintiff cannot assert a claim for municipal liability under Section 1983, *see Brown*, 89 N.Y.2d at 194 ("A plaintiff seeking to recover on the basis of respondeat superior simply does not come within the terms of [S]ection 1983.").

By contrast, municipal liability under a theory of respondeat superior *is* cognizable under state constitutional-tort law. *See Vilkhu* v. *City of New York*, No. 06 Civ. 2095 (CPS) (JO), 2008 WL 1991099, at *8 (E.D.N.Y. May 5, 2008) ("In [*Brown*, 89 N.Y.2d at 172], the New York State Court of Appeals recognized the availability of damages causes of action against the state for equal protection and search and seizure violations[.]").  Because state constitutional-tort claims can proceed under a respondeat superior theory, whereas Section 1983 provides no such remedy, the latter "does not provide an adequate alternative remedy for Plaintiff's state-constitutional claims[.]" *Alwan*, 2018 WL 2048366, at *11; *see also Espinoza* v. *City of New York*, 194 F. Supp. 3d 203, 208 (E.D.N.Y. 2016).  Here, because Plaintiff's *Monell* claim fails as a matter of law, he has no alternative remedy to vindicate his State constitutional rights against the City of New York.  Though the evidence produced in discovery may ultimately show that Plaintiff's claim fails on the merits, the Court must protect Plaintiff's right to pursue that claim.  For this reason, the Court rejects Defendants' argument that Section 1983 provides Plaintiff with "an alternative remedy that ... adequately protect[s] his interest." (Def. Br. 18).

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is DENIED IN PART and GRANTED IN PART.  Plaintiff's false-arrest, unreasonable-search-and-seizure, and failure-to-intervene claims survive as to Officers Baserap and

Rittenhouse, and his New York State constitutional-tort claim under Article I, Section 12 survives as to the City of New York.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge* v. *United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is directed to terminate Docket Entry 32. The parties are hereby ORDERED to submit a joint status letter and a proposed case management plan, on or before **August 10, 2018**, that comply with the Court's Notice of the Initial Pretrial Conference. If in light of Plaintiff's *pro se* status, the parties are unable to confer and file a joint letter and proposed case management plan, Moving Defendants are directed to file the documents separately. Plaintiff may, but is not required, to file his own letter and proposed case management plan. Any submissions must be filed by August 10, 2018.

SO ORDERED.

Dated:      July 10, 2018
New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge


*Sent by First Class Mail to:*
Sean Sullivan
General Delivery
390 Ninth Avenue
New York, NY 10001